# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# MONROE DIVISION

| | |
|---|---|
| JAMES O'NEAL | CIVIL ACTION NO. 17-1234 |
| VERSUS | JUDGE TERRY A DOUGHTY |
| UNION PACIFIC RAILROAD CO. | MAG. JUDGE KAREN L. HAYES |

## RULING

This matter arises from an accident at a railroad crossing. Pending before the Court is a Motion for Summary Judgment [Doc. No. 21] filed by Defendant Union Pacific Railroad Co. ("Union Pacific"). Plaintiff James O'Neal ("O'Neal") filed a Motion for Extension of Time to respond to the Motion for Summary Judgment [Doc. No. 29], an opposition memorandum to the Motion for Summary Judgment [Doc. No. 32], and a Motion to Continue Trial and Pretrial Deadlines [Doc. No. 31]. Union Pacific filed a memorandum in opposition to the Motion for Extension of Time [Doc. No. 28] and memorandum in opposition in part to the continuance of any pre-trial deadlines [Doc. No. 33], but not the continuance of trial. Finally, Union Pacific filed a reply in support of its Motion for Summary Judgment [Doc. No. 34].

For the following reasons, O'Neal's Motion for an Extension of Time is DENIED, Union Pacific's Motion for Summary Judgment is GRANTED, and O'Neal's Motion to Continue is DENIED AS MOOT.

## I. FACTS AND PROCEDURAL HISTORY

On August 29, 2016, O'Neal, a seasonal employee of McLeod Farms, was driving a tractor trailer loaded with corn to the grain bins in Mer Rouge, Louisiana. At approximately 8:47 a.m.,

O'Neal, who was traveling eastbound, proceeded onto the railroad tracks in front of a southbound Union Pacific locomotive at the Harp Lane crossing, resulting in a collision.

O'Neal had driven over that crossing hundreds of times. The Harp Lane crossing is posted with a stop sign and cross buck. The engineer operating the train, Timothy Bland ("Bland"), sounded the horn on the train's approach to the crossing. O'Neal alleged in his original Petition that he had stopped at the crossing, but at his deposition, he admitted that he does not have a distinct memory of stopping. The train's lead engine had a Track Image Recorder ("TIR") that recorded the view of the engine looking forward down the track. The video shows O'Neal failing to stop at the stop sign and proceeding over the crossing. Upon viewing the video, he admitted that he must not have stopped.

The lead engine was also equipped with an Event Recorder that records data, including speed, throttle position, amount of train air braking, and horn. The Event Recorder confirmed Bland's account that he sounded the horn and also showed that the train was traveling fifty miles per hour when Bland applied the emergency brake. Because of the proximity to the crossing, however, Bland could not stop the train in time to avoid a collision.

O'Neal admitted: (1) if he had stopped at the stop sign and looked to his left, he would have seen the oncoming train; (2) if he had stopped at the stop sign, he would have avoided the accident; (3) the stop sign and crossbuck at the crossing gave him sufficient warning that he was approaching railroad tracks; (4) there was a stopped train on the siding, but it did not obscure his view of the oncoming train; (5) there was a field of corn adjacent to the tracks which had not been harvested, but it did not obscure his view of the oncoming train; (6) the TIR video contains an audio track on which the train's horn can be heard on its approach to the crossing; and (7) he has

no basis for the claim the train crew had ample time and opportunity to stop.

On August 29, 2017, O'Neal, acting *pro se*, filed suit in the Fourth Judicial District Court for Morehouse Parish, Louisiana. Union Pacific timely removed the case to this Court on September 27, 2017, under diversity jurisdiction.

On January 5, 2018, a Scheduling Order [Doc. No. 10] issued, setting trial for January 14, 2019. At that time, the discovery completion deadline was August 29, 2018. On August 23, 2018, counsel enrolled on behalf of O'Neal, and the following day, he filed an unopposed motion to continue the pre-trial deadlines. The Court granted the motion and, among others, extended the discovery completion deadline to September 17, 2018, and the dispositive motion deadline to October 31, 2018. O'Neal did not seek any further extensions or move to continue prior to the expiration of these deadlines.

On October 31, 2018, Union Pacific filed the instant Motion for Summary Judgment. [Doc. No. 21]. O'Neal's opposition was due no later than November 21, 2018.

On November 21, 2018, O'Neal filed a Motion for Extension of Time [Doc. No. 29]. O'Neal seeks a 60-day extension to respond to the Motion for Summary Judgment because "discovery is incomplete," and he needs additional time. *Id.* Union Pacific opposes the motion. [Doc. No. 28].

The same day O'Neal filed a Motion to Continue Trial and Pretrial Deadlines [Doc. No. 31] and opposition to the Motion for Summary Judgment [Doc. No. 32].

Union Pacific filed a Memorandum in Opposition to the Motion to Continue Trial and Pretrial Deadlines. [Doc. No. 33]. Union Pacific does not oppose a continuance of the trial date, but does oppose a continuance of the deadlines that have passed.

On November 26, 2018, Union Pacific filed a reply in support of its Motion for Summary Judgment [Doc. No. 34].

These motions are now ripe, and the Court is prepared to rule.

## II. LAW AND ANALYSIS

### A. Standard of Review

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

However, Rule 56(d) provides:

If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1) defer considering the motion or deny it;

(2) allow time to obtain affidavits or declarations or to take discovery; or

4

(3) issue any other appropriate order.

**B.     Rule 56(d) Motion**

First, the Court finds no basis to grant O'Neal's Motion for Extension and his request for 60-day deferral under Rule 56(d). Although O'Neal's counsel entered the case in August 2018, he was able to obtain an extension of the pending deadlines. Prior to the close of discovery, he did not move for a further extension of those deadlines, did not move for a continuance, and did not move to compel discovery from Union Pacific if, as he suggests, it was not being provided promptly. Instead, he waited until after the Motion for Summary Judgment was filed to raise these issues. As Union Pacific points out, a motion for summary judgment filed after the close of discovery is not premature, and no discovery is outstanding because the discovery deadlines are closed. Accordingly, O'Neal's Motion for Extension [Doc. No. 29] is DENIED, and the Court will consider the Motion for Summary Judgment based on the present record.

**C.     Motion for Summary Judgment**

Union Pacific moves for summary judgment on all of O'Neal's claims, arguing that he cannot meet his negligence burden because (1) he failed to stop and yield the right of way to the train; (2) he was not prevented from seeing the train; (3) the train crew sounded the horn; (4) the train crew could not prevent the accident; (5) the train was travelling within the federal maximum, and any excessive speed claim is preempted; and (6) any inadequate warning claim is also preempted.

### 1. Negligence

O'Neal raises a number of arguments to support his claim that Union Pacific was negligent in the subject accident. Union Pacific contends that he has failed to raise a genuine

issue of material fact for trial on these claims. The Court addresses all of O'Neal's claims here with the exception of the claims of excessive speed and inadequate warning.

Under Louisiana law, negligence claims are subject to a duty risk analysis containing five elements: "(1) whether the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) whether the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) whether the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) whether the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element; and (5) whether the plaintiff was damaged (the damages element)." *Hanks v. Entergy Corp.*, 944 So.2d 564, 579 (La. 2006).

Union Pacific moves for summary judgment on the bases that it did not breach any duty to O'Neal and that his negligence was the sole cause of the accident.

### a. Visibility

In his original Petition, O'Neal alleged that a stopped train on the siding north of the crossing impacted his view of the oncoming train. Additionally, in discovery responses he claimed that a field of unharvested corn obscured his view as well.

First, with regard to the stopped train, O'Neal later admitted that it did not obscure his view. O'Neal had crossed the track earlier that morning, while traveling westbound, with an empty truck. At that time, he noticed a stopped train to the north. However, the TIR video shows the south end of the stopped train on the siding was one mile north of the crossing at the time of the accident. During his deposition, O'Neal viewed the video and admitted that the stopped train did not obscure his view.

6

Second, with regard to the corn, O'Neal contradicted the discovery responses in his deposition, and that deposition testimony is further supported by the TIR video. He admitted that he was above the corn sitting in the driver's seat of the tractor trailer. The TIR video showed that O'Neal's driver's side window was past the corn at the point of the stop sign where he should have stopped. Union Pacific also presented evidence through its accident reconstructionist, Terry Reynolds, and its Risk Management Representative, Joshua Harris, that the corn did impede O'Neal's ability to see the oncoming train.

Given the evidence presented, the Court finds that O'Neal has failed to raise a genuine issue of material fact for trial that his vision was impeded or obstructed at the time of the accident. In this regard, Union Pacific is entitled to summary judgment on his claims.

### b. Train Crew's Actions

O'Neal also raised claims that the train crew acted negligently because it failed to sound the horn prior to the accident and that it failed to prevent the accident. Union Pacific, however, contends that it complied with its duty to sound the horn and that its crew could not have prevented the accident.

With regard to the sounding of the horn, it is undisputed that a train crew has a duty to sound a warning as it approaches a public crossing. Under 49 C.F.R. § 222.21(2), the train crew had a duty to sound the horn for fifteen seconds as it approaches a public crossing. However, the Event Recorder data showed that Bland began sounding the horn twenty-nine seconds prior to the collision and continued sounding it up to and through the time of the collision. The TIR video also has sound, and the horn can be heard on it as well.

Although O'Neal testified that he does not remember hearing the horn, his testimony is

7

contradicted by the objective evidence. He admits that the horn can be heard on the video and that the video was an accurate depiction of the events that occurred.

With regard to the duty of the train crew to avoid an accident, the Louisiana Supreme Court has instructed that "a train crew can presume that vehicles approaching railroad crossings will obey the law and stop in time to avoid an accident." *LeJeune v. Union Pacific R.R.*, No. 97-C-1843 (La. 04/14/98); 712 So.2d 491, 495 (citing *Ketcher v. Illinois Cent. Gulf R.R. Co.*, 440 So.2d 805, 809 (La. App. 1st Cir.1983); *Leger v. Texas & P.R. Co.*, 67 So.2d 775, 780 (La. App. 1st Cir.1953); *Bordenave v. Texas & New Orleans R.R. Co.*, 46 So.2d 525, 529 (La. App. Orl.1950)). A crew member has a corresponding duty "to do everything in [his] power to stop the train" once he can " no longer reasonably believe that" the driver "would be able to stop" his vehicle and that "a collision is imminent." *LeJeune*, 712 So. 2d at 495.

In this case, the evidence shows that O'Neal did not stop and proceeded across the Harp Lane crossing. Although the horn was sounded, O'Neal did not heed that warning. Once it was clear he was not going to stop or clear the tracks in time, Bland applied the emergency brake in an attempt to avoid the accident. Unfortunately, as the accident reconstructionist, Reynolds, declared, "[g]iven the train's distance and time to the crossing, at the time [O'Neal's] tractor trailer entered the tracks, it was not possible for the engineer to delay the train's arrival at the crossing to avoid collision." [Doc. No. 21-5, Terry Reynolds Declaration, ¶ 19]. O'Neal has not presented evidence sufficient to raise a genuine issue of material fact for trial on this claim either. Accordingly, Union Pacific is also entitled to summary judgment on O'Neal's claims regarding the sounding of the horn and the train crew's failure to avoid the accident.

8

## 2. Train Speed

Next, Union Pacific asserts that it is entitled to summary judgment on any claim by O'Neal that it was negligent based on the train speed. O'Neal responds that he requested evidence of the train speed and has not received it. He contends that the train was speeding which prevented it "from exhausting all evasive measures to avoid the subject accident." [Doc. No. 32, p. 6].

The Supremacy Clause to the United States Constitution provides that "the Laws of the United States . . . shall be the supreme Law of the Land." U.S. Const., ART. VI, CL.2. Congress has the power under the Supremacy Clause to preempt state law. Preemption may be express or implied.[1] *See Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992).

The Federal Railway Safety Act ("FRSA") was enacted to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. The FRSA contains an express preemption provision:

>    (a)   National uniformity of regulation.--(1) Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable.
>
>    (2)   A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more

---

[1] In the area of implied preemption, the Supreme Court has recognized "field preemption where state law intrudes in an area that Congress has reserved for federal jurisdiction," and "conflict preemption, where enforcement of state law cannot be accomplished while simultaneously complying with federal law." *Friberg v. Kansas City S. Ry. Co.*, 267 F.3d 439, 442 (5th Cir. 2001) (citing *English v. General Electric Co.*, 496 U.S. 72 (1990)). Only express preemption is at issue in this motion, as discussed *infra*.

stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order–

(A) is necessary to eliminate or reduce an essentially local safety or security hazard;

(B) is not incompatible with a law, regulation, or order of the United States Government; and

(C) does not unreasonably burden interstate commerce.

(b) Clarification regarding State law causes of action.--(1) Nothing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party–

(A) has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), covering the subject matter as provided in subsection (a) of this section;

(B) has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by either of the Secretaries; or

(C) has failed to comply with a State law, regulation, or order that is not incompatible with subsection (a)(2).

(2) This subsection shall apply to all pending State law causes of action arising from events or activities occurring on or after January 18, 2002.

(c) Jurisdiction.--Nothing in this section creates a Federal cause of action on behalf of an injured party or confers Federal question jurisdiction for such State law causes of action.

49 U.S.C. § 20106.

Despite the express preemption provision, the United States Court of Appeals for the Fifth Circuit has found that "FRSA preemption is even more disfavored than preemption generally." *United Transp. Union v. Foster,* 205 F.3d 851, 860 (5th Cir. 2000) (citing *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 515 (5th Cir. 1999)).

> The restrictive terms of its preemption provision "indicate[ ] that pre-emption will lie only if the federal regulations *substantially subsume* the subject matter of the relevant state law." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993) (emphasis added). When applying FRSA preemption, the Court eschews broad categories such as "railroad safety," focusing instead on the **specific subject matter contained in the federal regulation**. *See id.* at 665-75, 113 S.Ct. 1732. In sum, when deciding whether the FRSA preempts state laws designed to improve railroad safety, we interpret the relevant federal regulations narrowly to ensure that the careful balance that Congress has struck between state and federal regulatory authority is not improperly disrupted in favor of the federal government.

*Id.* (emphasis added).

The current preemption provision is the result of Congress's enactment of the Implementing Regulations of the 9/11 Commission Act of 2007, Pub.L. 110-53, 121 Stat. 266. Among other actions, Congress clarified "that when a party alleges that a railway failed to comply with a federal standard of care established by regulation or with its own plan, rule or standard created pursuant to a federal regulation, preemption will not apply."[2] *Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1215 (10th Cir. 2008); *see also Grade v. BNSF Ry. Co.*, 676 F.3d 680, 684-85 (8th Cir. 2012); *Zimmerman v. Norfolk Southern Corp.*, 706 F.3d 177-78 (3d Cir. 2013). Thus, even in the face of express preemption, Congress clarified that a party may assert a cause of action

---

[2]The 2007 amendment was a clarification, not a substantive amendment, so pre-2007 case law remains valid. *See Zimmerman*, 706 F.3d at 177.

for negligence against a railroad (1) for its failure to comply with a federal standard of care, if § 20106(b)(1)(A) applies; or (2) for its failure to comply with its own plan, rule, or standard created pursuant to a federal regulation, if § 20106(b)(1)(B) applies. *See Gauthier v. Union Pac. R.R. Co.*, 644 F. Supp. 2d 824, 835 (E.D. Tex. 2009) (citing *Van Buren v. Burlington Northern Santa Fe Ry. Co.*, 544 F.Supp.2d 867, 876 (D. Neb. 2008)).

The FRSA directs that the Secretary of Transportation is to "prescribe regulations and issue orders for every area of railroad safety . . . ." 49 U.S.C. § 20103. This power is exercised largely through the Federal Railroad Administration ("FRA"). *See* 49 U.S.C. § 103; 49 C.F.R. § 1.88. The FRA has set "maximum operating speeds" at which trains can travel on different classes of tracks. *See* 49 C.F.R. § 213.9. The Harp Lane crossing was on a section of track rated as Class 4, which has a maximum operating speed of 60 miles per hour for freight trains. 49 C.F.R. § 213.9.

The Supreme Court addressed train speed regulations in *CSX Transp. v. Easterwood*, 507 U.S. 658 (1993). Easterwood brought a wrongful death action against CSX, contending that CSX was negligent for operating the train at an excessive speed. Easterwood conceded that the train was traveling within the speed limit established by federal regulations issued pursuant to FRSA (less than 60 miles per hour), but she argued that CSX breached its duty to operate its train at a moderate and safe rate of speed. The Supreme Court held that § 213.9(a) "should be understood as covering the subject matter of train speed with respect to track conditions." *Id.* at 675 (citing to 49 C.F.R. § 213.9). Therefore, state negligence claims concerning train speed are preempted. *Id.* The *Easterwood* Court explained the regulations on "speed limits must be read as not only establishing a ceiling, but also precluding additional state regulation. . . ." *Id.*

More recently, the Fifth Circuit followed the Supreme Court and held in *Hesling v. CSX Transp., Inc*. 396 F.3d 632, 638 (5th Cir. 2005), that because the CSX train was traveling under the authorized track speed, state negligence claims regarding excessive speed were preempted. In *Hesling*, the plaintiff argued that FRSA only intended to set *track* speed, but left the *train* speed to the discretion of the railroads, relying on statements in the Federal Register.[3] *Id.* at 637. The Fifth Circuit rejected Hesling's arguments. As Hesling pointed out, the railroad may "target what type of track designations they want to maintain," but this fact does not allow them to "ignore federal regulations in setting their own train speeds"; "rather, they have the information and ability to tailor their operations to the particular track designations they desire, and in that way they are masters of their own universe." *Id.* at 638. Where the "train speed" was "well within the speed ratings promulgated by the FRA," the lower court did not abuse its discretion that Hesling's excessive speed claims were preempted.

Likewise, in this case, the Union Pacific train was operating a freight train on a Class 4 track, which, by federal regulation, limited the maximum operating speed to 60 miles per hour. Union Pacific has produced undisputed summary judgment evidence that its freight train was traveling 50 miles per hour before the emergency brake was applied. At that speed, Union Pacific's train was well under the designated speed limit.

---

[3] The applicable language provided that "'Notwithstanding some of the language in *Easterwood* that a cursory reading may otherwise indicate, FRA has never assumed the task of setting train speed. Rather, the agency holds railroads responsible for minimizing the risk of derailment by properly maintaining track for the speed they set themselves.'" *Hesling*, 396 F.3d at 637 (quoting *Track Safety Standards*, 63 Fed. Reg. 33,992, 33,999 (June 22, 1998) (codified at 49 C.F.R. pt. 213)).

O'Neal claims that he was not provided the evidence from the Event Data Recorder in discovery, but the event data was provided to O'Neal himself prior to enrollment of counsel, the documentation was also attached to the Motion for Summary Judgment [Doc. No. 21-8], and the expert reports based on the data were provided on November 2, 2018.

Given the evidence presented, the Court finds that O'Neal's claims based on the speed of the train are preempted, and Union Pacific is entitled to summary judgment.

### 3. Inadequate Warning

Finally, Union Pacific asserts that it is entitled to summary judgment on O'Neal's claims that signs at the crossing were inadequate because such claims are preempted by federal law and thus barred. O'Neal contends that the "assertion that federal law preempts state tort law in requiring adequate safety warning devices at railroad crossings is unweighty." [Doc. No. 32, p. 5]. He further contends that the evidence presented by Union Pacific is "late disclosure," and he should have the opportunity to "investigate the directive [Union Pacific] received from any governmental agency, and to determine that there was compliance thereto." *Id.*

Under the FRSA, "the Secretary of Transportation shall maintain a coordinated effort to develop and carry out solutions to the railroad grade crossing problem . . . ." 42 U.S.C. § 20134(a); *see also Norfolk Southern Ry. Co. v. Shanklin*, 529 U.S. 344, 347 (2000) (citing same). The Secretary of Transportation, through the Federal Highway Administration ("FHWA"), has promulgated regulations on grade crossing improvements which require "[a]ll traffic control devices proposed . . . [to] comply with the latest edition of the Manual on Uniform Traffic Control Devices for Streets and Highways supplemented to the extent applicable by State standards." 23 C.F.R. § 646.214(b)(1). The regulations further mandate that "adequate

warning devices" for railroad crossings when "[f]ederal-aid funds participate in the installation of the devices are to include automatic gates with flashing lights" if certain identified conditions are met. 23 C.F.R. § 646.214(b)(3)(i). "For crossings where the requirements of § 646.214(b)(3) are not applicable, the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of FHWA." 23 C.F.R. § 646.214(b)(4).

> The Supreme Court has held that where § 646.214(b)(3) and (4) . . . are applicable, state tort law is preempted." *Easterwood*, 507 U.S. at 670, 113 S.Ct. 1732. The *Easterwood* Court concluded that § 646.214(b)(3) and (4) displace state and private decision making authority by establishing a federal law requirement that certain warning devices must be installed. *Id.* The crucial factor in determining whether § 646.214(b) is applicable, is whether federal funds participated in the installation of the warning devices at the crossing. "The fact that federal funds participated in the installation of the warning devices legally presupposes that the Secretary approved and authorized that expenditure, which in turn legally presupposes that the Secretary determined that the safety devices installed were adequate to their task." *Hester v. CSX Transp. Inc.*, 61 F.3d 382, 387 (5th Cir. 1995). Once federal funds, and concomitantly federal approval, are given for a crossing's warning system the "'financing of the improvement project and its direction and control' are removed from the railroad, and claims against the railroad relating to the adequacy of the warnings are preempted." *Armijo v. Atchison, Topeka and Santa Fe Ry. Co.*, 87 F.3d 1188, 1190 (10th Cir. 1996). . . . The Supreme Court, in *Norfolk S. Ry. Co. v. Shanklin*, declared that it is the "displacement of state law concerning the devices' adequacy, and not the States' or the FHWA's adherence to the standard set out in § 646.214(b)(3) and (4) . . . that preempts state tort actions." 529 U.S. 344, 357-58 . . (2000).

*Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 644-46 (5th Cir. 2005); *see also Bader v. Kansas City Southern Ry. Co.*, 41,081 (La. App. 2d Cir. 2006); 930 So.2d 1152, 1156 (state tort claim alleging the inadequacy of warning devices at a railroad crossing preempted where federal funds were used to upgrade the railroad crossing at issue).

In this case, the crossing was equipped with a stop sign and railroad crossbuck signs.

15

Union Pacific presented evidence via the declaration of Paul Rathgeber ("Rathgeber"), its Director of Industry & Public Projects, that federal funds were used in the installation of the crossbuck ad stop sign at the Harp Lane crossing. [Doc. No. 21-14, Paul Rathgeber Declaration, ¶¶ 1-12]. He further declared that these warning devices were installed pursuant to a project notice and master agreement between the State of Louisiana Department of Highways and Union Pacific's predecessor-in-interest, Missouri Pacific Railroad. *Id.* at ¶7. Copies of the notice and agreement referred to by Rathgeber were attached to Union Pacific's Motion for Summary Judgment and show that the Harp Lane crossing was to include cross bucks and stop signs.[4] *Id.* at ¶¶ 8-9; [Doc. No. 21-16]. Thus, any state law claims based on the adequacy of the warnings at the Crossing appear to be preempted, as set forth in *Easterwood, Shanklin*, and their progeny.

O'Neal argues, however, that he needs additional time to depose Rathgeber and other employees regarding this issue. Union Pacific admits that it did not disclose the identity of Rathgeber or the documents until the filing of its Motion for Summary Judgment. However, Union Pacific also points out that O'Neal himself is the only person who conducted discovery in this case. The Court is aware that O'Neal's counsel did not enroll until August 2018, but he also apparently failed to conduct discovery during the extended deadline he asked for and received from the Court and failed to move for any additional extension or for a continuance prior to the close of the deadlines. If O'Neal's counsel believed that the discovery which had been provided by Union Pacific was not responsive or inadequate, he also had the option to file a motion to compel, which he also failed to do. Finally, even if the Court were inclined to reopen

---

[4] The Harp Lane is located in Bonita, according to the documents, another community in Morehouse Parish.

discovery, the law is clear on this area of preemption. Counsel's opinion of the law does not change the fact that the Court is bound to apply Supreme Court and Fifth Circuit precedent.

Even so, the Court has also considered whether certain recognized exceptions may apply. First, the Supreme Court in *Easterwood* recognized the "duty to slow or stop . . . to avoid a specific, individual hazard." 507 U.S. at 676 n.5. However, O'Neal has not pointed to any such specific, individual hazard in this case. He merely says that the stop sign was not in the "appropriate" place.

Second, there is also a statutory local safety or security hazard exception. *See* 49 U.S.C. § 20106(a)(2)(A); *Hesling*, 396 F.3d at 640; *Easterwood*, 507 U.S. at 675 n.15. The § 20106(a)(2) savings clause "allows states to adopt additional or more stringent state regulation[s] related to railroad safety to prevent a local hazard, but only if the state law is not incompatible with federal regulation and does not burden interstate commerce." *Hesling*, 396 F.3d at 640 (citing 49 U.S.C. § 20106; *Easterwood*, 507 U.S. at 662). The savings clause is to be "narrowly construed." *Id.* (citing *Easterwood v. CSX Transp., Inc.*, 933 F.3d 1548, 1553 n.3 (11th Cir. 1991) (citing H.R. REP. NO. 1194 (1970), reprinted in 1970 U.S.C.A.A.N. 4104, 4117)). O'Neal has not pointed to any state law, regulation, or order related to railroad safety or security which is applicable to his claims, but, instead, relies only on the general law of negligence which does not appear to be encompassed by the exception. Further, the local condition savings clause does not apply where a condition is statewide in character or is capable of being adequately addressed in the national standards created by the Secretary of Transportation. This was a standard crossing with no conditions that were particular to the location or area. Accordingly, no local safety or security hazard exception applies.

Under these circumstances, the Court finds that Union Pacific is also entitled to summary judgment on any of O'Neal's claims related to the adequacy of the warnings at the Harp Lane crossing.

### III. CONCLUSION

This was an unfortunate accident, but O'Neal has not presented evidence or law sufficient to defeat Union Pacific's summary judgment, or to show that any cause other than his own failures resulted in his injuries. For the foregoing reasons, O'Neal's Motion for Extension of Time [Doc. No. 29] is DENIED. Union Pacific's Motion for Summary Judgment [Doc. No. 21] is GRANTED, and O'Neal's claims are DISMISSED WITH PREJUDICE. O'Neal's Motion to Continue Trial and Pretrial Deadlines is DENIED AS MOOT.

MONROE, LOUISIANA, this 27th day of November, 2018.

TERRY A. DOUGHTY
UNITED STATES DISTRICT JUDGE